1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    HENLEY FINANCE, LTD.,                     No. 2:20-cv-01834-DJC-KJN

            Plaintiff,                          ORDER DENYING MOTION FOR
12                                              SUMMARY JUDGMENT

13        v.

14    GOYETTE & ASSOCIATES, INC., a
      California corporation; BIOSCIENCE
15    ENTERPRISES, INC., a California
      corporation; and DOES 1 THROUGH
16    20, inclusive,

            Defendants.
17

18

19        This case arises from a disputed loan transaction involving CBD products in

20   2019 between two companies: Plaintiff Henley Finances, Ltd. ("Henley"), which was

21   founded by Richard Butler; and Defendant Bioscience Enterprises, Inc. ("Bioscience"),

22   whose President and authorized agent is Richard Parker.  This suit concerns a

23   transaction involving money that was transferred from Henley to Bioscience, in which

24   Bioscience's lawyer, Paul Q. Goyette and his law firm ("Goyette") was the intermediary.

25   Regarding the claims against Goyette, Henley alleges that Goyette held the money in

26   escrow, and that he breached several duties owed to Henley, including by disbursing

27   the funds to his client, Bioscience, without authorization and by failing to disclose the

28   status of the funds.  Goyette now moves for summary judgment, arguing that an

1  escrow was never created, and that he is thus entitled to judgment as a matter of law.

2  For the reasons set forth below, the Court DENIES Goyette's Motion for Summary

3  Judgment (ECF No. 35), concluding that a reasonable jury could find that an escrow

4  was created and that Plaintiff is therefore entitled to relief.

5  **BACKGROUND**

6  **I.    Factual Background**

7      **A.    Henley Explores the CBD Industry**

8        In January 2019, Henley was looking to invest in the CBD industry.  (*See* Compl.

9  (ECF No. 1) ¶ 8 .)  Around the same time, Goyette entered into a Fee Agreement with

10  Bioscience to provide transaction services, litigation services, and escrow services.

11  (*See* Decl. of Thomas Rivera in [ ] Supp. of Goyette's Mot. for Summ. J. ("Rivera Decl.")

12  Ex. 10 (ECF No. 35-4 at 166–212), at 37–44 (providing a copy of the 1/14/2019 Fee

13  Agreement).)

14        In March 2019, Robert Kay, Henley's agent at the time, entered into an

15  agreement with another company called Commodity Clearinghouse Corporation or

16  "C3."  (*See* Rivera Decl. Ex. 9 (ECF No. 35-4 at 135–42), at 3–10 (providing a copy of

17  the 3/12/2019 hemp trade agreement between C3 and Kay).)  This agreement

18  between C3 and Robert Kay contemplated escrow services that involved Goyette's

19  firm and used Goyette's IOLTA (interest on lawyer trust account) to hold money for

20  future CBD transactions.  (*See* Decl. of Michael J. Aguirre in Supp. of Henley's Opp'n

21  to Goyette's Mot. for Summ. J. ("Aguirre Decl.") Ex. 14 (ECF No. 40-6 at 30–33), at 1–2

22  (providing a copy of an email from Goyette explaining the process).)

23      **B.    Henley Enters into the Henley-Bioscience Loan Agreement**

24        Subsequently, on July 2, 2019, Henley (through Butler) and Bioscience (through

25  Parker) agreed that Henley would give $1.25 million "in the form of a Direct Loan for

26  the Use of Bioscience business operations, and to conduct the trade of Hemp derived

27  CBD isolate."  (Aguirre Decl. Ex. 1 (ECF No. 40-5 at 1–3) [hereinafter Henley-Bioscience

28  Loan Agreement or 7/2/2019 Henley-Bioscience Loan Agmt.].)  In return, the Henley-

1  Bioscience Loan Agreement states that "Bioscience agrees to return the Loan Principal

2  ($1,250,000) and Fifty Percent (50%) of the Gross Margin from any Hemp CBD

3  Buy/Sell Transaction that involves funds from the Loan Principal by Lender." (7/2/2019

4  Henley-Bioscience Loan Agmt. at 1.) "In any case the principal and any related fees

5  will be returned to Lender No Later Than September 3, 2019." (*Id.*)

6          Rather than directly sending the money to Bioscience, Henley wired the funds

7  into Goyette's lawyer trust account.  Although Goyette denies knowledge of any

8  agreement between Henley and Bioscience, the use of Goyette's trust account

9  appears to have been based on the earlier C3 transaction.  (*See* Henley's Opp'n to

10  Goyette's Mot. for Summ. J. (ECF No. 40) 13 [hereinafter Opposition or Opp'n]

11  (citations omitted); Dep. of Robert Kay 21:2–25 [hereinafter Kay Dep. Tr.] (explaining

12  that Goyette previously offered escrow services for the C3 transaction); Dep. of

13  Richard Parker 34:1–35:9 [hereinafter Parker Dep. Tr.] (explaining that it was his

14  understanding that Henley's loan money would "be placed in a trust account with

15  Goyette" because Bioscience, through Parker, "told them that we had used - - that we

16  used Goyette[ ]").)  Important for resolving the Motion for Summary Judgment are

17  seven communications involving the principal actors that provide context to Henley's

18  $1 million wire to Goyette for the "Direct Loan" to Bioscience.

19          **1.**      **The July 9th Communications: The Day Before the Wire**

20       [**1**] On July 9, 2019, around 8:00 PM Pacific Standard Time ("PST"), Parker,

21  Bioscience's President; Butler, Henley's Founder; and Kay, Henley's agent, exchanged

22  emails regarding an "Update" to how the loan would be funded.  (*See* Rivera Decl. Ex.

23  9 (ECF No. 35-4 at 148–49), at 16–17 (providing a copy of the 7/9/2019 email from

24  Parker to Kay, copying Butler).)  Henley and Bioscience agreed that Henley would

25  immediately send one payment of $625,000, "with the balance to be confirmed in the

26  next few days . . . to show proof of funds." (*Id.*)  They also agreed to "review the

27  account status in the morning and take it from there." (*Id.*)

28  ////

[**2**] Then, at 10:07 PM PST, Bioscience (through Parker) emailed Goyette. (*See* Aguirre Decl. Ex. 7 (ECF No. 40-6 at 1–2) (providing a copy of the 7/9/2019 emails between Parker and Goyette).) Parker informed Goyette that two wires of $625,000 from outside accounts would be coming from a loan the next day. (*See id*.) Parker also provided instructions for Goyette to: (a) immediately wire $600,000 to Bioscience's account; (b) pay outstanding fees related to another litigation; and (c) pay himself (Goyette) a fee. (*See id*.) Goyette confirmed receipt of the email 18 minutes later, stating that he would look for the transaction in the morning. (*See id*.)

### 2. The July 10th Communications: The Day of the Wire

[**3**] The next morning, Kay followed up on his prior email to "review the account status in the morning and take it from there." (*See* Rivera Decl. Ex. 11 (ECF No. 35-4 at 213–14) (providing a copy of the 7/10/2019 email from Kay to Bioscience).) Kay emailed Bioscience and Parker at 2:44 PM when he was in London (6:44 AM PST) about some "Housekeeping" issues. (*Id*.) Kay mentioned creating a "clear plan to execute and address" a "Letter to order from Goyette for RB funds" and a "Cash flow for RB $1m[.]"[1] (*Id*.)

[**4**] Later, Goyette noticed the nearly $1 million in his lawyer trust account, which he stated "surprised" him and prompted him to begin calling his clients until he reached Parker, Bioscience's President. (*See* Mem. of P. and A. in Supp. of Def.'s Mot. for Summ. J. (ECF No. 35-1) 6 [hereinafter Motion or MSJ] (quoting Decl. of Paul Q. Goyette in [ ] Supp. of Goyette's MSJ (ECF No. 35-5) ¶ 8 [hereinafter Goyette Decl.]).) During this phone call, Parker told Goyette that the $1 million belonged to him, and again gave Goyette instructions to disburse the money. (*See* Dep. of Paul Q. Goyette 29:15–30:13, 108:10–25 [hereinafter Goyette Dep. Tr.].) According to Goyette, "[a]t no time did Mr. Parker tell [Goyette] that [he] needed the approval of anyone else to disburse the funds." (Goyette Decl. ¶ 9.)

---

[1] For purposes of this Motion, the Court assumes that "RB" was an abbreviation for Richard Butler, Henley's Founder.

1  [**5**] Sometime after this call, Goyette emailed Bioscience's Parker to confirm that

2  he tried transferring $600,000 at 11:15 AM PST to Bioscience's account, and that he

3  otherwise disbursed the funds and assessed a fee.  (*See* Aguirre Decl. Ex. 13 (ECF No.

4  40-6 at 26–29), at 1–2.)  Goyette assessed an "Escrow fee of $5000 (50 basis points of

5  the $1 million)[,]" consistent with the fee stipulated in the Goyette-Bioscience Fee

6  Agreement.  (Aguirre Decl. Ex. 13, at 2; *see also* Rivera Decl. Ex. 10, at 38 ("Fees for

7  Escrow Services described above shall be described in the Escrow Engagement

8  documents and, unless otherwise agreed by the Parties, shall be .05% of total monies

9  deposited into Escrow.").)

10       **3.      The July 11th Communications: The Day After the Wire**

11  [**6**] The next day, on July 11th, at 9:47 AM PST (5:47 PM in London), Kay

12  emailed Henley's Founder, Butler, an "Update" that the funds were "visible at Wells

13  Fargo . . . [,]"and that "Paul Goyette will do the 'Letter to Henley Finance Order[.]'"

14  (Aguirre Decl. Ex. 12 (ECF No. 40-6 at 24–25) (providing a copy of the 7/11/2019 email

15  from Kay to Henley).)  Kay testified that this letter was supposed to be "from Mr.

16  Goyette specifically stating that nothing will leave his client's account, which we are to

17  believe was Richard Butler's account, without his order, without his instruction."  (Kay

18  Dep. Tr. 67:11–14.)  Kay also testified that "at his time, [they] still didn't have the – the

19  letter from Mr. Goyette, which had been requested, stating that everything would be

20  to Richard Butler's order."  (*Id.* 66:24–67:2.)

21  [**7**] Finally, at 11:09 AM PST (7:09 PM in London), Kay had about a six-minute

22  phone call with Goyette.  (*See* Compl. ¶ 24; Kay Dep. Tr. 22:2–25.)  The parties hotly

23  contest what transpired on the call, but according to Kay, Goyette confirmed to Kay

24  that the funds were received and acknowledged the instruction "stipulated" to

25  Bioscience that no funds be disbursed without the permission of Henley through

26  Butler [hereinafter the preauthorization instruction].  (*See* Kay Dep. Tr. 22:2–25.)

27  Goyette, however, declared that he does "not recall having this discussion [with Kay

28  on July 11, 2019], nor do[es] [he] recall receiving any instructions from Mr. Kay

regarding any Henley funds." (Goyette Decl. ¶ 10.)  Kay also testified that he does not

recall what Goyette said on the conversation, but he did "recall that [the

preauthorization instruction and escrow] was received with acknowledgment[,]" and

that he believed that Goyette fully understood the request and "acknowledged the

undertaking . . . ."  (Kay Dept. Tr. 23:1–9.)

#### 4.      The July 16th Transfer: Most of the Funds Are Gone

Several days later, on July 16th, Bioscience's President, Parker, instructed

Goyette to send $378,000 to a supplier called CETC under a contract that Bioscience

had negotiated and for which Bioscience had requested Goyette's assistance.  (*See*

MSJ 6–7 (citations omitted); Aguirre Decl. Ex. 10 (ECF No. 35-4 at 180–91), at 14–25

(providing a copy of the CETC-Bioscience Supply Agreement).)  By this time, most of

Henley's nearly $1 million (at least $978,000 out of the $999,950) was gone and

disbursed from Goyette's IOLTA.

#### C.      Henley's Attempts to Retrieve the Funds

By the terms of the Henley-Bioscience Loan Agreement, the principal and any

related fees were due no later than September 3, 2019.  (*See* 7/2/2019 Henley-

Bioscience Loan Agmt. at 1.)  Throughout July and August, there were several

communications between Henley and Bioscience, including an "estimated timeline" of

"anticipated returns" on August 20, 2019.  (MSJ 7 (citation omitted).)  The proposed

timeline stated that Henley would receive a payment by the end of August.  (*See id.* 8.)

On August 28th, Henley's Founder, Butler, emailed Goyette about the "Return

of Funds."  (*See* Aguirre Decl. Ex. 16 (ECF No. 40-6 at 43–45), at 1 (providing a copy of

the 8/28-8/29/2019 emails between Butler, Goyette, and Parker).)  In the email, Butler

told Goyette that "Richard Parker has informed me he has instructed you to make a

wire transfer to my Henley Finance business account for $1,100,000.  Please can you

confirm when this will be executed and supply a proof of payment for my records."

(*Id.*)  Goyette responded on August 29th, where he stated that he had "not heard from

my client Mr. Parker on this transaction yet," but assured Butler that he would "be in touch" once he spoke to Parker.  (*Id.*)

On September 6th, Henley's Founder, Butler, emailed Goyette.  (*See* Aguirre Decl. Ex. 17 (ECF No. 40-6 at 46–47) (providing a copy of the 9/6/2019 email from Henley's Butler to Goyette.)  Butler asked Goyette to "confirm how much you are holding on account for me, and do not release any funds, as discussed on the telephone without my consent please."  (*Id.*)  That same day, Bioscience's President, Parker, sent an email to Goyette and copied Butler about the "Usage of Funds."  (*See* Aguirre Decl. Ex. 18 (ECF No. 40-6 at 48–49) (providing a copy of the 9/6-9/7/2019 emails between Goyette, Butler, and Parker).)  Parker instructed Goyette "that no funds of Richard Butler or Henley Finance are to be used without the express written authorization of Richard Butler himself.  No party from BioScience shall be authorized to access that capital in any matter."  (*Id.*)  Goyette responded on September 7th, indicating his understanding.  (*See id.*)  Goyette also discussed opening a separate lawyer trust account for Henley.  (*See id.*)  Goyette does not appear to have informed Mr. Butler or any agent of Henley that, in fact, the funds had already been spent.  (*See* Opp'n 23 (citing Goyette Dep. Tr. 120:7–13).)

Also on September 7th, Kay emailed Bioscience and Henley about "a $1m problem that we all have a responsibility to preserve."  (Rivera Decl. Ex. 9 (ECF No. 35-4 at 156–57), at 25 (providing a copy of the 9/7–9/8/2019 emails between Goyette, Kay, Henley, and Bioscience).)  Parker responded the next day, revealing that some CBD products and materials purchased for the July 16th CETC transaction were "not going to pass future tests, [and] the man we purchased it from is more than likely a fraud and is not going to have the funds for immediate return as a result.  This means regardless of the outcome BioScience is still responsible for all funds."  (*Id.*)

Soon after, on September 10th, Henley, through Butler, asked Goyette about securing the funds because he had not "had any correspondence regarding these deals as promised in the agreement[,]" and because Bioscience had "problems with

7

1  the last deal . . . ." (Rivera Decl. Ex. 9 (ECF No. 35-4 at 165), at 33 (providing a copy of

2  the 9/6–9/10/2019 emails between Butler, Goyette, and Parker).)  Following this, the

3  record indicates that the relationship between the parties soured as Henley sought

4  repayment.  (*See* MSJ 8 (citing an email Butler sent Goyette on 2/13/2020 where

5  Butler asked about finding a "productive way" for Bioscience to repay the money).)

6  **II.    Procedural Background**

7        Henley filed the Complaint on September 11, 2020.  (See Compl. 12.)  Goyette

8  filed the instant Motion on May 30, 2023 seeking to dismiss the two causes of action

9  against him; Bioscience is not a party to this Motion.  (*See* MSJ (ECF No. 35).)  The

10  Court heard arguments on the Motion on August 18, 2023, where Attorney Andrew

11  Stroud appeared for Goyette and Attorneys Michael Aguirre and Maria Severson

12  appeared for Henley.  (*See* ECF No. 42.)  At the conclusion of the hearing, the Court

13  offered the parties the opportunity to file supplemental briefing on whether an

14  attorney may, consistent with any ethical and legal obligations, charge a fee for

15  disbursing proceeds from a loan that was deposited into the attorney's trust account.

16  (*See id.*)  Henley and Goyette filed supplemental briefing on August 24, 2023.  (*See*

17  ECF Nos. 44–45.)  The Motion is now fully briefed.

**DISCUSSION**

19  **I.    Legal Standard**

20        The Federal Rules of Civil Procedure provide for summary judgment when "the

21  pleadings, depositions, answers to interrogatories, and admissions on file, together

22  with affidavits, if any, show that there is no genuine issue as to any material fact and

23  that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c);

24  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  One of the principal purposes of

25  Rule 56 is to dispose of factually unsupported claims or defenses.  *Celotex*, 477 U.S. at

26  325.  Therefore, the "threshold inquiry" is whether "there are any genuine factual

27  issues that properly can be resolved only by a finder of fact because they may

28  reasonably be resolved in favor of either party[,]" or, conversely, "whether it is so one-

8

1   sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*,

2   477 U.S. 242, 250–52 (1986). But "the mere existence of *some* alleged factual dispute

3   between the parties will not defeat an otherwise properly supported motion for

4   summary judgment[.]" *Id.* at 247–48. "Only disputes over facts that might affect the

5   outcome of the suit under the governing law will properly preclude the entry of

6   summary judgment." *Id.* at 248.

7         In a summary judgment motion, the moving party always bears the initial

8   responsibility of informing the court of the basis for the motion and identifying the

9   portion of the record "which it believes demonstrates the absence of a genuine issue

10  of material fact." *Celotex*, 477 U.S. at 323. If the moving party meets its initial

11  responsibility, the burden then shifts to the opposing party, which "must establish that

12  there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith*

13  *Radio Corp.*, 475 U.S. 574. 585 (1986). To meet its burden, either party must "(A) cit[e]

14  to particular parts of materials in the record, . . . or (B) show[ ] that the materials cited

15  do not establish the absence or presence of a genuine dispute, or that an adverse

16  party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

17  56(c)(1).

18        For the opposing party to succeed and avoid summary judgment, the party

19  "must do more than simply show that there is some metaphysical doubt as to the

20  material facts*." Matsushita*, 475 U.S. at 586. The opposing party must put forth more

21  than "a scintilla of evidence in support of the [party's] position . . . ." *Anderson*, 477

22  U.S. at 252. Rather, the opposing party must produce enough evidence such that "the

23  'specific facts' set forth by the nonmoving party, coupled with undisputed background

24  or contextual facts, are such that a rational or reasonable jury might return a verdict in

25  its favor based on the evidence." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors*

26  *Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, for the moving party to

27  succeed, the Court must conclude that no rational trier of fact could find for the

28  opposing party. *Matsushita*, 475 U.S. at 587. However, so as not to "denigrate the

1  role of the jury[,]" "[c]redibility determinations, the weighing of the evidence, and the

2  drawing of legitimate inferences from the facts are jury functions," and so the Court

3  draws all reasonable inferences and views all evidence in the light most favorable to

4  the opposing party. *Anderson*, 477 U.S. at 255; *see Matsushita*, 475 U.S. at 587–88.

5  **II.   Analysis**

6      Because Henley wired money to Goyette's lawyer trust account, Henley argues

7  that an escrow arose that included the specific oral instruction that no money be

8  disbursed from Goyette's lawyer trust account without Henley's permission (the

9  preauthorization instruction).  (*See* Opp'n 5–8, 14.)  In contravention of this alleged

10  instruction, however, Bioscience executed several transactions that used the money

11  Henley sent Goyette without preauthorization.  (*See* Goyette's Resp. to Henley's

12  Additional Statement of Undisputed Material Facts Re: Goyette's MSJ (ECF No. 41-1),

13  at 20, 22–27 (providing Henley's 38th and 43rd through 50th statements of facts that

14  are all disputed).)  These subsequent transactions using Henley's money give rise to

15  the first and third causes of action against Goyette for conversion of the funds and

16  breach of fiduciary duties, respectively.  (*See* Compl. ¶¶ 32–34 (first cause of action for

17  conversion against Goyette); *id.* ¶¶ 41–46 (third cause of action for breach of fiduciary

18  duty against Goyette).)  Goyette counters, however, arguing that he never agreed to

19  be the deposit-holder of the escrow and that he was unaware of any instruction that

20  the funds not be disbursed without Henley's authorization.  He points to the

21  transactions complained of by Henley and the communications related to them as

22  evidence that there was never a preauthorization instruction and that Henley and

23  Butler consented to the use of any of these funds.  (*See* Reply Mem. of P. and A. in

24  Supp. of Goyette's MSJ (ECF No. 40) 1–2 [hereinafter Reply].)

25      For purposes of summary judgment, this case comes down to three basic

26  questions: (1) whether a jury can find that – before Henley wired the funds–

27  Bioscience and Henley had the mutual understanding that any escrow transaction with

28  Henley's money would include the preauthorization instruction; (2) and if so, whether

1    Goyette knew of and consented to the terms of the escrow and being the escrow

2    holder, and (3) whether Goyette violated any duties arising from the contemplated

3    escrow transaction.  As explained below, there is sufficient evidence to show that a

4    mutual understanding between Bioscience and Henley was established regarding the

5    preauthorization instruction before the funds were wired to Goyette.  *See infra* Part

6    II.A.1.  In addition, there is direct and indirect evidence in the record from which a jury

7    could find that Goyette accepted the role of deposit-holder and escrow agent and

8    that Goyette knew that Henley deposited the money and intended to create the

9    escrow pending further instructions.  *See infra* Part II.A.2.  A reasonable jury could

10   further find that Goyette breached fiduciary duties owed to Henley by failing to

11   disclose the status of the funds held inside the escrow.  *See infra* Part II.B.  Finally, in

12   light of the above and additional circumstantial evidence in the record, a jury could

13   find that Henley did not consent to or ratify the funds being disbursed outside of an

14   escrow account pending further instruction.  *See infra* Part II.C.

15          **A.      Henley Provides Sufficient Evidence Regarding the Escrow**

16          Although Goyette disputes whether an escrow arose (*see, e.g.*, Reply 1), each

17   of the other parties involved, Bioscience's Parker, Henley's Butler, and Robert Kay, all

18   agreed and testified that an escrow in Goyette's lawyer trust account would be used to

19   hold the $1 million from Henley.  (*See* Opp'n 12–13.[2])  Therefore, the fundamental

20   issue in this case is whether an escrow with the preauthorization instruction was

21   contemplated between Henley and Bioscience.

22          The preauthorization instruction is key to resolving the issues before the Court.

23   If the preauthorization instruction was part of the mutual understanding between

---

[2] (*See also* Parker Dep. Tr. 198:10–200:24 ("Q: No.  But you understood in your discussions at least with Mr. Butler that there was an understanding that Goyette would provide the escrow services for the Henley money."  A: Yes."); Butler Dep. Tr. 49:7–16 ("Rob Kay had been through this similar business with Bioscience, and we were just following the same process that he went through when he did his business with Bioscience."); *id.* 75:21–76:2 (same); Kay Dep. Tr. 54:20–56:24 ("The – the one point that we constantly referenced was the escrow account, that it had to be under a protected - - protected status, legally protected status.  We weren't going to just send him the money to do what he wanted to do.  That was absolutely sacrosanct at the time of that conversation.").)

1  Henley and Bioscience for the Loan Agreement, and Goyette was aware of this

2  instruction, then the preauthorization instruction changes the nature of the transaction

3  from a loan to an escrow.  Regarding the third cause of action for breach of fiduciary

4  duty, it is the existence of an escrow that gives rise to fiduciary duties in the first

5  instance, including the duty to disclose information.  Second, regarding the first cause

6  of action for conversion, the claim is based on Goyette and Bioscience using the

7  money without proper authorization; if it was a mere loan, Henley would not have had

8  a right to immediate possession of the funds.

9        "An escrow involves the deposit of documents and/or money with a third party

10  to be delivered on the occurrence of some condition."  *Summit Fin. Holdings, Ltd. v.*

11  *Cont'l Lawyers Title Co.*, 27 Cal. 4th 705, 711 (2002) (citing 2 Miller and Starr, *Cal. Real*

12  *Estate Procedure and Practice* Ch. 6 Escrows § 6:1 (4th ed. June 2023 Update)

13  [hereinafter Miller and Starr, Escrows]; Cal. Fin. Code § 17003(a)).  "An escrow holder

14  is an agent and fiduciary of the parties to the escrow."  *Id.* (citing *Amen v. Merced*

15  *Cnty. Title Co.*, 58 Cal. 2d 528, 534 (1962); *Rianda v. San Benito Title Guar. Co.*, 35

16  Cal. 2d 170, 173 (1950)).  "The agency created by the escrow is limited . . . to the

17  obligation of the escrow holder to carry out instructions of each of the parties to the

18  escrow."  *Summit*, 27 Cal. 4th at 711 (citations omitted).  The escrow holder is liable for

19  the failure to follow instructions.  *See id.* (citing *Amen*, 58 Cal. 2d at 532).  "Absent

20  clear evidence of fraud, an escrow holder's obligations are limited to compliance with

21  the parties' instructions."  *Id.* (citing *Lee v. Title Ins. and Trust Co.*, 264 Cal. App. 2d

22  160, 162 (1968); Miller and Star, Escrows § 6:26).

23        The limited agency theory of an escrow is what gives rise to Goyette's potential

24  liabilities, which requires differentiating what those duties are and when they arise.

25  There are three key moments in an escrow, each creating different obligations

26  between the parties (the promisor and promisee) and the agent (the escrow holder).

27        First, there is the moment when a binding contract arises between the promisor

28  and the promisee.  If there is no binding contract between the promisor and the

1  promisee before the promisor transferred the documents and/or money into the

2  deposit-holder's account, the deposit-holder is an "intermediary [and] an agent" of the

3  party that transferred the item "whose power can be revoked or changed at the will of

4  the one who has appointed [the agent]." *Restatement (2d) of Agency* § 14D

5  Reporter's Notes (1958) (May 2023 update); *Holland v. McCarthy*, 173 Cal. 597 (1917)

6  (citing *Cannon v. Handley*, 72 Cal. 133, 144 (1887)).

7  　　　　Second, there is the delivery of the documents and/or money into the deposit-

8  holder's account, at which point the items held in the escrow become irrevocable.  At

9  this point, the deposit-holder is, "prior to the performance of the conditions of the

10  escrow, the agent of both parties thereto[.]" *Shreeves v. Pearson*, 194 Cal. 699, 707

11  (1924) (citing *Cannon*; *McDonald v. Huff*, 77 Cal. 279 (1888)); *see* The Rutter Group,

12  *Cal. Prac. Guide: Real Property Transactions* ¶ 4581:5 (Sept. 2022 Update) [hereinafter

13  Rutter Group, Use of an Escrow] (citations omitted) (same); *Restatement (2d) of*

14  *Agency* § 14D Comment a (same); Miller and Starr, Escrows § 6:11 (same).  That is,

15  prior to the completion of the escrow instructions (commonly called the close of

16  escrow), the escrow holder owes independent obligations to parties to the escrow.

17  The duties an escrow holder owes to both principals, though more limited than similar

18  duties for general agents, includes the duty to disclose information that is:

19  (1) acquired by the escrow holder in the escrow in which both principals are parties,

20  and (2) is "specific material information pertinent to matters within the same escrow

21  that could have a substantial adverse effect on the principal . . . ." *In re Marriage of*

22  *Cloney*, 91 Cal. App. 4th 429, 440 (2001) (citing, among other sources, Miller and

23  Starr, Escrows §§ 6:23, 6:26); *see* Miller and Starr, Escrows § 6:13 (same); Rutter

24  Group, Use of an Escrow ¶ 4:582.5.  *But see* Rutter Group, Use of an Escrow ¶ 4:645.1

25  (limiting the duty to disclose to when the escrow holder knows that a party to the

26  escrow is relying on it for protection as to facts learned by the escrow holder).

27  　　　　Finally, but not relevant here, there is the close of escrow, when the instructions

28  have been completed or have failed to be completed within the time specified.  At

1   this point, the agent's role is limited to the rights that each party has to the items in the

2   escrow.  *See Shreeves*, 194 Cal. at 707; Rutter Group, Use of an Escrow ¶ 4:581.6

3   (same); *Restatement (2d) of Agency* § 14D Comment b (same); Miller and Starr,

4   Escrows § 6:26 (same); *also* Miller and Starr, Escrows § 6:25 (discussing the rights of

5   the parties to the items held in the escrow upon no performance by either party and

6   full performance by either or both parties).

        **1.**      **Henley Can Establish a Mutual Understanding Regarding the
Preauthorization Instruction Before the Funds Were Wired**

9         Goyette first argues that the preauthorization instruction was not part of the

10   Henley-Bioscience Loan Agreement and therefore is not part of the contract between

11   Henley and Bioscience.  (*See* MSJ 1, 12–15; Reply 10 and n.5; Goyette Decl. ¶ 9.)

12   However, Henley, mostly through Henley's agent, Robert Kay, provides evidence from

13   which a reasonable jury could find that Henley established a mutual understanding

14   with Bioscience regarding the preauthorization instruction on the morning of July 10,

15   2019, before the $1 million were wired to Goyette and before Goyette disbursed the

16   funds.  Kay emailed Parker and other members of Bioscience on July 10th about

17   "Housekeeping," where he mentioned a "Letter to order from Goyette for RB funds"

18   and a "Cash flow for RB $1m[.]"  (Rivera Decl. Ex. 11.)  Henley then points to a July

19   11th email from Kay to Butler about an "Update" that mentions that "Paul Goyette will

20   do the Letter to Henley Finance Order[,]" which was a letter meant to memorialize the

21   preauthorization instruction.  (Aguirre Decl. Ex. 12.)  The July 10th and July 11th

22   emails seem similar enough in content (both discussing the $1 million and a letter

23   from Goyette regarding those funds) to permit an inference that the two letters involve

24   the same matter, and Kay testified that the July 11th email was about an outstanding

25   letter to memorialize the preauthorization instruction.  (*See* Kay Dep. Tr. 66:24–67:2.)

26   Kay also testified that he received the information contained in the July 11th email

27   from Parker.  (*See id*. 64:7–69:15 (explaining that "this information was given to me by

28   Parker" but stating that only the information regarding the funds being visible and in

1  the account was given).)  Finally, while the Loan Agreement does not contain the

2  preauthorization instruction, it does reference a requirement that Bioscience will

3  provide "Escrow balance summaries for each transaction" (7/2/2019 Henley-

4  Bioscience Loan Agmt. at 2), consistent with this evidence.  Therefore, a jury can

5  reasonably find that there was a mutual understanding regarding the preauthorization

6  instruction between Henley, through Butler, and Bioscience, through Parker, based on

7  these emails with Kay, as well as Kay's deposition testimony.

8       **2.     A Jury Can Find That Goyette Assented to An Agency**

9       Goyette's principal contention is that no escrow existed because he never

10  accepted the role as the depositor-holder of the escrow.  (*See, e.g.*, Reply 3–6.)

11  Escrows are contractual in nature.  *See* Rutter Group, Use of an Escrow ¶ 4:573

12  ("Escrow transactions are *contractual* in nature and, so, cannot be created without the

13  agreement of seller, buyer and escrow holder.").  Like any other contract, escrows

14  require mutual assent or understanding between the contracting parties.  *See, e.g.*,

15  *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (collecting cases

16  from California to apply California state law).

17       Under California law, mutual consent or assent "is determined by objective

18  rather than subjective criteria, the test being what the outward manifestations of

19  consent would lead a reasonable person to believe." *Monster Energy Co. v.*

20  *Schechter*, 7 Cal. 5th 781, 789 (2019) (citation omitted).  California courts have held

21  that mutual assent may be manifested by written or unspoken words, or by conduct,

22  and acceptance of contract terms may be implied through action or inaction.  *See*

23  *Knutson*, 771 F.3d at 565 (citations omitted).  Therefore, "an offeree, knowing that an

24  offer has been made to him but not knowing all of its terms may be held to have

25  accepted by his conduct, whatever the terms the offer contains." *Knutson*, 771 F.3d at

26  565 (citations omitted).

27       Here, Goyette does not dispute that he accepted the $1 million deposit from

28  Henley, instead arguing that Henley provides no evidence to prove Goyette accepted

the role.  (*See* Reply 4–6.)  However, Henley provides both circumstantial and direct evidence from which a reasonable jury could find that Goyette objectively assented to being an agent for the contemplated escrow transaction.  For direct evidence, Henley points to the July 10th email from Goyette to Parker where, after disclosing that the earlier $1 million incoming wire was still pending, Goyette stated: "In addition, from those monies I will assess three fees or invoices as follows: 1. Escrow fee of $5000 (50 basis points of the $1 million). . . ."  (Aguirre Decl. Ex. 13.)  Goyette did in fact take an escrow fee of $5,000, which used the calculation stipulated in Goyette's Fee Agreement with Bioscience.  (*See* Opp'n 15; Rivera Decl. Ex. 3 (ECF No. 40-5 at 20–34), at 2, 10 (providing copies of the Fee Agreements between Goyette and Bioscience that state that "Fees for Escrow Services described above shall be . . . .05% of total monies deposited into Escrow[ ]").)

Henley also points to the fact that the Fee Agreements contain a clause expressly excluding any legal services not provided for in the contract, and the contract only provides for three types of services: (1) transactional services; (2) litigation; and (3) escrow services.  (*See* Opp'n 15; Rivera Decl. Ex. 3, at 1, 6, 8–9.)  If the contract excludes all other services such that the only services provided are transactional, litigation, and escrow services, then the only plausible explanation according to Goyette's own contract is that he provided escrow services.  This is further supported by Goyette's own declaration where he revealed that he "played no role in negotiating the Henley-Bioscience loan or drafting the Henley-Bioscience Loan Agreement[,]" therefore precluding the only plausible alternative explanation of charges for transactional services.  (Goyette Decl. ¶ 6; *see* Reply 1, 3, 11.[3])

---

[3] At oral argument, counsel for Goyette observed that the Fee Agreement also required specific documents be executed for any escrow services, which did not happen.  The suggestion is that if Henley relies on one portion of the fee agreement (the exclusive list of services provision), then it must rely on the entirety of the agreement (which would also include the escrow documents).  This is a fair point, but one that would go to the weight a jury would give these respective facts.

1        Furthermore, Kay testified that when he called Goyette on July 11, 2019, he did

2   so to "corroborate" information Parker gave to Kay, which included discussing the

3   "Letter to Henley Finance Order" referred to in the July 10th and July 11th emails

4   mentioned earlier. (*See* Kay Dep. Tr. 64:7–68:6.)  Kay further testified that, at the time

5   of his call with Goyette, he was aware of the $1 million being sent to Goyette's "escrow

6   account[,]" and stated that "[i]t was stipulated to Richard Parker in unequivocal terms

7   that that money was to go nowhere and not be released without [Henley's]

8   permission, and that was confirmed verbally." (*Id.* 22:6–12.)  That is, Kay testified to

9   having all of the knowledge required to know that Henley and Bioscience created an

10  escrow.[4]

11       Although Goyette declared that he does not recall having this discussion and

12  does not recall receiving any instructions from Kay (*see* Goyette Decl. ¶ 10), Kay's

13  testimony indicated otherwise.  Faced with conflicting evidence, the Court must take

14  the non-movant's evidence because it will be for a jury to decide whether to find Kay's

15  testimony more credible.  *See, e.g.*, *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285,

16  1288–89 (9th Cir. 1987) (citation omitted).  Therefore, a jury could find that Goyette

17  was aware of the escrow's preauthorization instruction at least as of July 11, 2019.

18       Goyette further argues that he did not know that the funds belonged to or

19  came from Henley, so he cannot be an agent for Henley. (*See* MSJ 5–6, 12; Goyette

20  Dep. Tr. 30:18–25; *id.* 119:25–120:13.)  But, as Henley points out, "Goyette noted

21  'Henley' in its wire transfer of Henley's funds to Bioscience that day[.]" (Opp'n 1; *also*

22  Aguirre Decl. Ex. 10 (ECF No. 40-6 at 7–10), at 3  (providing a copy of the receipt for

23  the funds from Wells Fargo that lists "Henley Finan" as the third-party reference);

24  Aguirre Decl. Ex. 22 (ECF No. 40-7 at 1–3), at 1 (providing a copy of Goyette's lawyer

25  trust account summary that shows "Henley Finance Limited" listed under the $1 million

26  

27  

28  

---

[4] Given the state of the evidence, it is possible that a jury could find that while Goyette was unaware of the preauthorization instruction before the July 11th phone call with Kay, at which time he had already disbursed over $600,000 in funds, he was aware of the instruction following that call.  This would go to the question of damages, however, not liability.

1   wire on 7/10/2019).)  In addition to this direct evidence, Henley points to the March

2   2019 C3 transaction with Kay that used Goyette's IOLTA as an escrow and the April

3   2019 Spyker bonds conversation with Butler that contemplated using Goyette's IOLTA

4   as an escrow as indirect evidence that Goyette knew or should have known that it was

5   Henley that deposited the funds into his IOLTA with the intent to create an escrow.

6        Goyette also tries to argue that any conflicts arising from the contemplated

7   escrow transaction would necessarily conflict with the duties he owes to his client,

8   Bioscience, thereby apparently absolving him of any liability.  (*See, e.g.*, Mot. 17–18;

9   Reply 7, 9–11.)  While it may be true that Goyette's actions gave rise to a potential

10  conflict, at most that shows that he *shouldn't* have accepted the escrow, not that he

11  *didn't*.  Attorneys, unfortunately, sometimes fall short of their ethical obligations, and

12  California courts have recognized that a cause of action for breach of fiduciary duties

13  as an escrow holder may arise against an attorney – despite the attorney representing

14  the client/adverse party, as here.  *See Wasmann v. Seidenberg*, 202 Cal. App. 3d 752,

15  757 (1988); 1 Witkin, *California Procedure* Ch. I Attorneys § 324 (6th ed. March 2023

16  Update).

17       To summarize: (1) a jury can find that Henley and Bioscience established a

18  mutual understanding regarding the preauthorization instruction as of the morning of

19  July 10, 2019, before the $1 million were wired to Goyette's lawyer trust account, and

20  (2) a jury could further find that Goyette was aware that Henley deposited the money

21  and intended to create an escrow as of July 10, 2019 and that Goyette assented to

22  accepting any agency arising from the deposit and escrow.

23       **B.    A Jury Could Find That Goyette Breached Duties to Disclose Material
             Information Regarding the Status of the Funds**

24

25       Having found that a reasonable jury could find that an escrow was created by

26  the parties, the question remains of whether there is sufficient information to establish

27  that Goyette breached a duty arising from the escrow.  The Court concludes there is.

28  Breach of any duty is a factual question left for the jury.  *See Spaziani v. Millar*, 215 Cal.

App. 2d 667, 683–84 (1963); *Diaz v. United Cal. Bank*, 71 Cal. App. 3d 161, 169–70 (1977).  Having found that an escrow arose and that the escrow created duties owed by Goyette to Henley, a reasonable jury could conclude that Goyette violated the duty to strictly comply with the preauthorization instruction.  *See Spaziani*, 214 Cal. App. 2d at 682.  Moreover, an escrow agent has a duty to disclose information regarding documents and instructions held inside the escrow that arises from the right of each party to the escrow to see all documents, instructions, and items within the escrow.  *See Cloney*, 91 Cal. App. 4th at 440 and n.10 (citations omitted); Miller and Starr, Escrows § 6:13 and n.12 (collecting cases); *id.* § 6:28 and n.14 (collecting cases).  A jury could find that Goyette failed to disclose the status of the funds (their non-existence) to Henley in the August and September emails after the $1 million was disbursed from the escrow, in violation of this obligation.  (*See* Opp'n 13.)

For the reasons set forth above, the Court DENIES Goyette's Motion for Summary Judgment on Henley's third cause of action for breach of fiduciary duties.

### C.      A Jury Could Find Goyette Converted Henley's $1 Million

Conversion under California law requires a plaintiff to show: "(1) she possessed property, (2) the defendant disposed of the property in a manner inconsistent with the plaintiff's property rights, and (3) damages."  *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016) (citing *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015)).  The Ninth Circuit has held that a conversion claim arises where: (1) an attorney transfers funds without authorization, and (2) the owner identifies a specific sum of money.  *Id.* (citing *Virtanen v. O'Connell*, 140 Cal. App. 4th 688, 707–08 (2006)).

Goyette first argues that there is no right to immediate possession if there is no escrow.  (*See* MSJ 19–23; Reply 12–13.)  As stated above, however, there is enough evidence to find that an escrow arose, which Goyette concedes is enough to provide the right to immediate possession.  (*See* MSJ 21; *also* Opp'n 22.)

Goyette's alternative argument opposing the conversion claim is that Henley implicitly or explicitly consented to the use of the funds and knew about the funds

19

1  being used.  Goyette points to the July 10th email where Kay (Henley's agent) states

2  that he was sure Bioscience was busy trading the funds.  (*See* Reply 12; MSJ 22.)

3  Goyette also seizes on the July 16, 2019 transaction involving a company called CETC,

4  and additional subsequent transactions using Henley's funds, to argue that Henley

5  consented to the use of the funds.  (*See* MSJ 7–8, 11, 21–23; Reply 12–13.)  However,

6  Butler testified that neither Parker nor anyone at Bioscience told Henley that the funds

7  were disbursed from the escrow.  (*See, e.g.*, Butler Dep. Tr. 77:4–80:4 (explaining that

8  the deal "was that, when they were closing, they required money in escrow, and it

9  would never leave the escrow account, similar to the deal with Goyette[]"); *id.* 97:3–13

10  (explaining that he had assumed that none of the funds had been used because he

11  had not heard back from Goyette and this was because "the nature of the business

12  was that the funds were held in escrow[]").)  Additionally, Parker testified that he did

13  not ask for Henley's permission regarding any of the July transactions.  (*See* Parker

14  Dep. Tr. 120:6–17; 131:17–132:8.)  Parker also agreed that his "best recollection now"

15  was that he did not need to tell Henley about the funds already being disbursed by

16  the time Butler emailed Bioscience on July 31st because Parker thought he could

17  recoup the money and because he thought it best to not tell Henley bad news so soon

18  into the relationship.  (*See id.* 165:2–21.)  Moreover, there is an email from Butler to

19  Parker, Kay, and Goyette, where Butler asked Parker to instruct Goyette to wire him

20  "$25,210 from the funds held by Paul Goyette to [his] order."  (Parker Dep. Tr. Ex. 6, at

21  1–2 (bates stamped PLTF 0009 through PLTF 0010).)  This email suggests that Henley

22  thought that using the money required additional instructions, and that the funds were

23  still in Goyette's escrow.  A question of fact thus exists whether Henley consented to

24  the use of the funds, and summary judgment on this basis is inappropriate.

25          For these reasons, the Court DENIES Goyette's Motion for Summary Judgment

26  on the first cause of action for conversion.

27  ////

28  ////

**CONCLUSION**

For the reasons set forth above, the Court DENIES Goyette's Motion for Summary Judgment (ECF No. 35).


IT IS SO ORDERED.

Dated:   **September 28, 2023**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC3 – Henley20cv1834.msj